# UNITED STATES DISTRICT COURT
## SOUTHERN DISTIRCT OF NEW YORK

**JUDGE BUCHWALD**

**05 CV 6529**

|  |  |
|---|---|
| MICHAEL CONNELLY, M.D. | ) |
| Plaintiff, | ) |
| v. | ) |
| JACK GRAY, ECCE CULINA, LLC, and CHESTNUT GROUP, LLC, | ) |
| Defendants. | ) |

**COMPLAINT**

RECEIVED
JUL 19 2005
U.S.D.C. S.D. N.Y.
CASHIERS

## INTRODUCTION

1.     This action arises out of the repeated and continuous fraud and wrongful conduct of the defendant Jack Gray ("Gray") who fraudulently and wrongfully induced the plaintiff Michael Connelly, M.D. ("Dr. Connelly"), to invest in a restaurant venture called Ecce Culina; continued to misrepresent the status of the venture after he took money from Dr. Connelly and other investors; refused to return the investment and to provide information relating to the venture despite repeated requests made by Dr. Connelly; and, upon information and belief, absconded with the investment of Dr. Connelly and others. The defendant's fraud and misrepresentations, which are described more fully herein, include but are not limited to, the defendant's representations that he was a successful and experienced businessman when he had a history of fraud and forgery, including a conviction for bank fraud; that Ecce Culina had sufficient capital to acquire and would acquire the William Greenberg Bakery -- the critical centerpiece to its business plan -- when, in fact, Gray knew that Ecce Culina had not raised enough capital to

purchase the Bakery, a fact that Gray continued to conceal through various misrepresentations even after the plans to purchase the Bakery had long fallen through.

## THE PARTIES

2.   Plaintiff Michael Connelly, M.D., is a resident of North Andover, Massachusetts.

3.   Defendant Jack Gray is a resident of New York, New York.

4.   Defendant Ecce Culina, LLC, is organized under the laws of Delaware and its principle place of business is New York, New York.  Ecce Culina, LLC is managed and/or controlled by defendant Gray and/or another entity known as The Chestnut Group, LLC, which is controlled by Gray.

5.   Defendant The Chestnut Group, LLC, is upon information and belief, an entity controlled by defendant Gray with its principle place of purported business to be New York, New York.  Defendant Gray represented The Chestnut Group, LLC as being duly organized under the laws of Delaware.  Contrary to this representation, there is no limited liability company with the name of "The Chestnut Group" incorporated in Delaware or even New York. Hereinafter, The Chestnut Group LLC and defendant Jack Gray will be collectively referred to as the "Gray defendants."

## JURISDICTION

6.   This action arises, in part, under § 10(b) of the 1934 Securities Exchange Act, 15 U.S.C. §78j(b), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5.  Jurisdiction, therefore, is proper under § 27 of the 1934 Securities Exchange Act, 15 U.S.C. § 78aa.

7.   Venue is proper in this District under § 27 of the 1934 Securities Exchange Act, 15 U.S.C. § 78aa, because defendants Jack Gray, Ecce Culina, LLC, and The Chestnut Group LLC all reside in and/or transact business in this district.

8.      Jurisdiction is also proper under 28 U.S.C. § 1332 because Dr. Connelly has suffered damages in excess of $75,000, the precise amount to be proven at trial, and because Dr. Connelly is a resident of Massachusetts and defendant Gray is a resident of New York, and defendant Chestnut Group LLC and Ecce Culina LLC have their principle place of business in New York.

## THE FACTS

### Ecce Culina Background

9.      Sometime in or about 2002, the defendant Gray organized, formed, and promoted a business known as Ecce Culina, LLC ("Ecce Culina"), which was represented to be in the process of developing a chain of novel and profitable rustic-themed artisan bakery cafes in New York City.  The Ecce Culina concept was designed to take advantage of the artisan bakery café trend that was developing in New York City.   In developing Ecce Culina, Gray purportedly studied cafes like Le Pain Quotidien, a business operating on Madison Avenue in New York City, as well as other successful restaurant ventures.

10.   The Ecce Culina concept was designed to improve upon the New York artisan bakery cafés by using a concept of serving hot food without having a full commercial kitchen onsite.  This concept had been perfected by John Doherty, who was the Executive Chef of the Waldorf Astoria Hotel in New York for almost two decades.  The food preparation concept consisted of pre-cooking high-quality entrées, packaging the meal in a Cryovac bag and immediately freezing the entrée, which could then be easily transported to an Ecce Culina café location, and quickly prepared for serving using a convection oven.

3

11.    Sometime in 2002, Gray prepared, or caused to be prepared, a Private Placement Memorandum of Ecce Culina, LLC (the "PPM"), which described the business plan of Ecce Culina. The PPM is dated January 22, 2002.

12.    According to the PPM, which was prepared by Gray or someone acting under his direction and control, the concept of Ecce Culina was described in great detail. Moreover, the former owner of Le Pain Quotidien USA, who purportedly owned and managed the Le Pain Quotidien location on West 72nd Street, New York City, was represented to be part of the Ecce Culina management team; and John Doherty, the Executive Chef of the Waldorf Astoria for nearly two decades, was represented to be another member of Ecce Culina's management team.

13.    According to the PPM, Ecce Culina was seeking to raise $1,500,000. the PPM also represented that $400,000 of this amount was to be spent to acquire the William Greenberg Bakery chain (the "William Greenberg Bakery"), which would provide the necessary kitchen equipment and space, as well as profits, for developing at least ten Ecce Culina Cafés.

14.    On or about May 15, 2002, Gray incorporated Ecce Culina, LLC, as a limited liability company organized under the laws of Delaware.

**Dr. Connelly's Introduction to Ecce Culina**

15.    Sometime in the spring or summer of 2002, Dr. Connelly was introduced to Ecce Culina, which was established and run by the defendant Gray.

16.    Sometime in the summer of 2002, Dr. Connelly received a copy of a proposed Operating Agreement of Ecce Culina and the PPM. These documents were sent to Dr. Connelly in Massachusetts by the defendant Gray in New York using the United States Postal Service.

17.    With respect to the PPM, the plaintiff carefully read and reasonably and justifiably relied on the representations made therein, including but not limited to (a) representations made

4

by Gray as to his prior history and track record as a successful businessman, (b) representations as to the acquisition of the William Greenberg Bakery for $400,000, and (c) representations as to the corporate structure and availability of the William Greenberg Bakery.

18.   After Dr. Connelly received the proposed Operating Agreement and PPM, he had a number of telephone conversations with the defendant Gray regarding the Ecce Culina venture. These telephone conversations took place during the summer of 2002, with Dr. Connelly participating by telephone from Massachusetts and the defendant Gray participating from New York.

19.   During these phone conversations, Gray repeatedly explained and confirmed the representations made in the proposed Operating Agreement and PPM, described above.

**Representations In Ecce Culina PPM**

20.   Dr. Connelly reviewed and reasonably relied on the representations in the PPM prior to his purchase of his interest in Ecce Culina.  Among the representations relied upon by Dr. Connelly, were the following:

21.   The first page of the PPM, in part, states:

Ecce Culina, Inc. ("EC") is seeking to raise $1,500,000 to finance (i) the acquisition of Wm. Greenberg Bakery, (ii) the conversion of Wm. Greenberg retail bakery into an EC café and (iii) the opening of at least three new cafés.

\*          \*          \*

For this initial investment of $1.5 million, the Company is offering a 9.0% preferred annual interest rate plus a 35.0% equity interest in the Company.

22.   The PPM specifically represented that it would cost $400,000 to purchase the "Greenberg Bakery" business, and $50,000 to renovate its Third Avenue location.

5

23.   The "compelling" and critical component of the Ecce Culina business plan, as articulated by the PPM, was the acquisition of the William Greenberg Bakery business. The PPM represented that the Bakery's Third Avenue location was large enough to allow it to provide pre-cooked food and pre-baked artisan breads and desserts in sufficient quantities to support ten Ecce Culina cafés; that the Third Avenue location could function as a commissary kitchen; that the William Greenberg Bakery had a flash freezer, sufficient freezer storage, and a delivery van;  "and most important, Wm. Greenberg Bakery is profitable - approximately $450,00 per year in Operating Profit."

24.   The PPM discussed how two full-time and two part-time members of Ecce Culina's management team would provide the unique entrepreneurial and managerial experience and expertise for its operation and success.

25.   The PPM described how

> Mr. Gray is in mergers and acquisitions for his own account.  He owned Shofar Kosher Foods, Inc., which he sold to Sara Lee in 1995.  Prior to that, he was a partner in Norwich Milano Foods, which manufactured exotic pasta for the hotel and restaurant industry as well as imported a line of premium foods from Italy.  In the 70's and 80's, Mr. Gray was a real estate developer who built a 250 unit town house community in the Catskills; estate homes in Greenwich, CT. and mid-rise multi-use buildings in the Tri-State region.  Mr. Gray will bring his management skills and real estate skills to EC to structure the corporate side of the company as well as oversee the roll out of EC's new stores.

26.   The PPM also described how the cooking techniques developed and mastered by Doherty would lead to increased revenues when implemented in the Ecce Culina cafés; how Doherty's "menu solutions" and expertise in the food business was central to Ecce Culina's anticipated success and revenue; and how Scarborough had experience in managing and training employees in similarly themes rustic bakery cafés.

6

**Representations in Operating Agreement**

27.     As is described above, sometime in or about the spring or summer of 2002, Gray provided Dr. Connelly with the proposed Operating Agreement.  Once Dr. Connelly received the Operating Agreement, he carefully read and reviewed the same and had a number of telephone conversations with Gray about proposed changes relating to minor or typographical errors.

28.     After the phone conversations described above, Gray sent another revised Operating Agreement to Dr. Connelly, who was located in Massachusetts, using the United States Postal Service.  Once he received the revised Operating Agreement, Dr. Connelly carefully read and reviewed the same.

29.     Among the specific representations that Dr. Connelly relied upon are the following:

(a)     The Operating Agreement listed "The Chestnut Group, LLC, a Delaware limited liability Company" as its Managing Member.  The Operating Agreement of The Chestnut Group, LLC, which was also provided to Mr. Connelly at this time, listed its members as Jack Gray, John Doherty, and Robert Scarborough.  Dr. Connelly was not a member of or affiliated with The Chestnut Group, LLC.

(b)     Section 4.1 of the Agreement, titled "Capital Accounts," stated:

> The Company shall establish and maintain a separate capital account ("Capital Account") for each member and its legal representatives, successors and permitted assigns.  The Capital Account of each Member shall consist of the amount of cash and fair market value of the property contributed by such Member (net of liabilities securing such contributed property assumed by the Company or subject to which the Company takes the contributed property) increased by allocations of Profits and gain on Disposition pursuant to Section 4.2 hereof, and of tax-exempt income, if any, and decreased by allocations of Losses 4.2 hereof, by distributions and withdrawals of cash and property...

(c)     Section 5.1 stated that the "Managing Member shall have the full, exclusive and absolute right, power, and authority to manage and control the Company and the

7

property, assets, affairs and business thereof." It also stated: "the Members (as members) shall have no voice or participation in the management of the Company's business, and no power to bind the Company or to act on behalf of the Company in any manner whatsoever."

(d) Section 5.4 of the Agreement stated:

The Managing Member shall be responsible for the conduct of the business of the Company as set forth in this Agreement in such manner as to maximize the value of the Company's assets, and the Managing Member shall devote such time to Company business as is necessary, desirable and appropriate in the Managing Member's reasonable judgment.

(e) Section 5.5 of the Agreement states:

The Managing Member shall have fiduciary responsibility for the safekeeping and use of all funds, property and assets of the Company, whether or not in its control, and shall not employ, or permit another to employ, such funds, property or assets in any manner except as otherwise expressly set forth herein or for the benefit of the Company.

(f) Sections 6.1 through 6.3 of the Agreement provided that the Managing Member had the responsibility to keep "complete books of accounts," "maintain one or more bank accounts for such funds of the Company," and to prepare income tax returns for the Company.

30. The final page of the Operating Agreement that Dr. Connelly ultimately signed stated that a total of $550,000 had already been raised from four different investors -- more than enough to purchase the William Greenberg Bakery business at the represented $400,000 purchase price.

**Trip to New York**

31. In reliance on the representations made by Gray over the telephone, in the PPM, and in the Operating Agreement, Dr. Connelly made arrangements to travel to New York to meet with Gray to further discuss the venture.

32.   On September 19, 2002, Dr. Connelly traveled to New York City with his brother-in-law.   That morning, Dr. Connelly met with John Doherty at the Waldorf Astoria Hotel. Doherty described the novel process that would allow Ecce Culina's cafés to provide high quality food at affordable prices, while earning a higher profit margin than other existing premium bakeries.

33.   After meeting with Doherty, Dr. Connelly had lunch at a Le Pain Quotidien Café, the model for Ecce Culina, located at 1131 Madison Avenue, Manhattan.

34.   Once Dr. Connelly finished lunch he visited two bakeries that were both purportedly part of the William Greenberg Bakery business.   One of these bakeries was the oen identified in the PPM as being the "Third Avenue Location" of the William Greenberg Bakery that contained a commissary kitchen. Mr. Connelly observed the bakery operations at both sites, and the commissary kitchen at the Third Avenue location.

35.   After visiting the bakeries, Dr. Connelly met with Gray at Grand Central Station. Gray confirmed all of the information that Dr. Connelly had previously heard about Ecce Culina, including Ecce Culina's acquisition of the William Greenberg Bakery.   Gray explained that it was the acquisition and operation of the Bakery that would provide the initial profits for the preferred 9% annual interest rate to be paid to members for their contribution.   Gray represented that the purchase of the William Greenberg Bakery would occur because the Bakery was a family run business, and the head of the family was ready to sell and get out of the business. Gray also confirmed that he would personally be responsible for presenting Ecce Culina's investors with regular reports and financial statements.   Finally, Gray spoke extensively about his past business successes and his current business ventures, which he characterized as all highly successful and profitable.

9

**Dr. Connelly's Investment**

36.    On December 26, 2002, Dr. Connelly sent a check for $50,000 to Gray in order to purchase a 2.25% membership share in Ecce Culina. The check was made out to Ecce Culina, LLC, and addressed to 120 East 34th Street, Apartment 9H, New York, NY 10016, which was Gray's address. Along with his check, Dr. Connelly sent a signed version of the Operating Agreement of Ecce Culina, LLC, which was dated April 23, 2002.

37.    In making this investment, Dr. Connelly relied on, inter alia, the representations made in the PPM, the Operating Agreement, and by Gray. He also relied on the purported experience and expertise of the managing members of Ecce Culina because he did not personally have any experience or expertise in the food industry, developing commercial real estate, or in managing an LLC or other for-profit corporate entity.

**Plaintiff's Post-Investment Communications**

38.    After Dr. Connelly invested in Ecce Culina, he had a number of telephone conversations with the defendant Gray. During these conversations, Dr. Connelly was located in Massachusetts and the defendant was located in New York.

39.    During the spring of 2003, Gray told Ecce Culina members that he had still not purchased the William Greenberg Bakery, as he had represented he would do, and claimed that the purchase was held up pending his final review and analysis of audited financial statements, which the current owners of the Bakery felt were too expensive to create.

40.    In the spring of 2003, the defendant Gray sent an Ecce Culina, LLC newsletter (the "Newsletter"), which was represented to be the first in a quarterly series that would be sent at the end of each quarter. The Newsletter was prepared in whole or in part by the defendant Gray or

10

someone working at his direction and control. Dr. Connelly received and reviewed this Newsletter.

41.   In the Newsletter, Gray stated that Ecce Culina would no longer pursue acquisition of the William Greenberg Bakery because the Bakery had sold the lease of its Third Avenue location to Fauchon, a French gourmet food company. The Newsletter represented that Gray was to evaluate and lease other potential store locations, including a site at the Roosevelt Hotel in Manhattan.

42.   The Newsletter represented that a manufacturing agreement had been executed in July 2003 with a Chef who operated a pizza and sandwich facility in Queens. That agreement stated that the Chef would be able to provide sufficient food to allow for the operation of "3-5 Ecce Culina" locations.

43.   The Newsletter also represented that there was strong interest from three additional and substantial investors to help fund and develop Ecce Culina.

44.   Finally, the Newsletter stated that it was "the first in a quarterly series which will be sent at the end of each quarter."

45.   Despite these purported representations as to Ecce Culina, Gray failed to provide the members with any documentation supporting these representations, including a copy of the alleged manufacturing agreement; failed to make or report any additional "progress" in developing Ecce Culina; and has failed to send out any additional newsletters or updates, as explicitly promised.

46.   In the fall of 2003, Gray represented to the members of Ecce Culina that he expected Ecce Culina's first café to open in January 2004, in an attractive site in Soho that would not cost as much to convert as other previously viewed sites.

11

47. At the end of 2003 and the beginning of 2004, the Soho site had still not been developed as Gray claimed it would be. Several investors began to express their displeasure with the lack of progress in developing Ecce Culina, and Gray became increasingly difficult to contact.

48. In the spring of 2004, Dr. Connelly was finally able to get in touch with Gray who represented to him that he was in extensive negotiations with a large investor who wanted to open Ecce Culina cafés in New Jersey. Gray stated that it would be possible for Dr. Connelly to sell his membership interest in Ecce Culina. Gray also indicated that if he was unable to open any Ecce Culina cafés at some point in the early part of 2004, he would return each member's investment.

49. In early May 2004, Dr. Connelly was once again able to get in touch with Gray who stated that he was close to completing a deal that would allow Dr. Connelly to sell his membership interest. He told Dr. Connelly to contact him again on May 10, 2004. Dr. Connelly called on that day, and a week later, but never received a response or answer.

50. In June 2004, Dr. Connelly sent an email to Gray expressing his frustration at not hearing back from him as he had promised. Gray instructed Dr. Connelly to only contact him by phone and stated that he would not engage in any email communications. Throughout the rest of the summer, numerous phone calls to Gray went unanswered.

51. In September 2004, Dr. Connelly had his last contact with Gray. Gray again stated that he was close to a deal that would allow Dr. Connelly to sell his membership interest. He also stated that he was close to finally completing a deal for a site for an Ecce Culina café, and that the final step was to meet with a New York City building inspector. Gray further stated that Dr. Connelly should call him back after the planned inspection. Dr. Connelly complied, and

12

after his initial attempts to re-establish contact with Gray failed, he finally reached him. Gray stated that the meeting with the building inspector had been delayed, and told Dr. Connelly to call him back the last week of September. Despite repeated calls, Dr. Connelly has not heard from Gray since these final conversations in September 2004.

52. On December 10, 2004, Dr. Connelly, through his attorneys, sent a letter to Gray recounting the investment terms of the Agreement, and summarizing Gray's various failures to develop Ecce Culina, and his various attempts at evading contact or accountability for the members' investments. The letter also made a formal demand that Gray produce:

1) Copies of all bank statements, cancelled checks, bills, contracts, invoices, receipts and other information documenting all investments in and expenses relating to the LLC;

2) All tax returns prepared on behalf of the LLC;

3) All agreements and draft agreements that have been executed on behalf of the LLC or were considered by the LLC; and

4) All documents reflecting any opportunities, potential opportunities or negotiations relating to any transaction that relates to the LLC or the business of the LLC.

53. To date, Gray has not only failed to produce the requested documents, but he has completely failed to reply to the letter at all.

54. To date, and despite his various evasions and vague references to the contrary, Gray has not, as promised and as required by the Agreement, pursued any exit opportunities for Mr. Connelly or any of Ecce Culina's other members.

**Defendant's Repeated and Continuing Fraud**

55. Starting with Gray's very first communications with Dr. Connelly, he embarked on a pattern of making numerous fraudulent misrepresentations and omissions with the specific intent to induce Dr. Connelly to invest his personal money into Ecce Culina. At the time Gray

13

made each of these fraudulent misrepresentations and omissions, he knew, or was reckless in not

knowing, that his statements and omissions were false and misleading, and that Dr. Connelly

would rely on those misrepresentations and omissions to his detriment.

56.  Gray's fraudulent misrepresentations and omissions, set out in particularity below,

include without limitation his misleading statements about his past business and real estate

experience that concealed his history of fraud and forgery, including a criminal conviction for

defrauding a bank, and his misleading statements about the planned acquisition of the William

Greenberg Bakery, including without limitation the misrepresentation that Ecce Culina had

raised enough capital to purchase the Bakery when this was not the case, and the

misrepresentation that the deal fell apart -- not because of his failure to raise sufficient capital --

but rather because the Bakery sold its Third Avenue location to another entity, when, in fact, the

Bakery actually shut-down its Third Avenue location well after the deal with Gray had fallen

apart, and long after the Bakery's operators had even been in touch with Gray.

**Gray Made Misleading Statements About His Business Experience and Successes,
and Concealed His Criminal Record and Prior Fraudulent Conduct**

57.  From the very first time that Dr. Connelly was introduced to the defendant Gray, the

defendant represented himself as an experienced and successful businessman.

58.  For example, according to the PPM, which was prepared by Gray or someone under

his direction and control, Gray represented himself as follows:

> Mr. Gray is in mergers and acquisitions for his own account. He owned
> Shofar Kosher Foods, Inc., which he sold to Sara Lee in 1995. Prior to
> that, he was a partner in Norwich Milano Foods, which manufactured
> exotic pasta for the hotel and restaurant industry as well as imported a
> line of premium foods from Italy. In the 70's and 80's, Mr. Gray was a
> real estate developer who built a 250 unit town house community in the
> Catskills; estate homes in Greenwich, CT. and mid-rise multi-use
> buildings in the Tri-State region. Mr. Gray will bring his management
> skills and real estate skills to EC to structure the corporate side of the
> company as well as oversee the roll out of EC's new stores.

14

59.    In addition, when Dr. Connelly met Gray in New York in September 2002, Gray told Dr. Connelly that his experience included purchasing a Kosher food business that he later sold to Sarah Lee for a substantial profit as well as a number of other business ventures that he directed on behalf of a number of large investors.

60.    These representations were reiterated and repeated during Gray's telephone calls and meeting with Dr. Connelly in the spring, summer, and fall of 2002.

61.    In deciding whether to invest in Ecce Culina, Dr. Connelly carefully considered and directly relied on Gray's representations regarding his purported integrity and past business and real estate experience, as well as his alleged successful track record, including his acquisition and sale of Shofar Kosher Foods.

62.    Directly and materially contrary to his representations regarding his credibility and solid track record in the real estate and business community, Gray's past business and real estate dealings to which he alluded to were largely built on fraud, forgeries, lies, and violations of numerous federal laws, which resulted in a federal conviction and jail sentence for defrauding a bank in the mid 1990s.

63.    In approximately March 1992, Gray and a co-conspirator created a scheme where they fraudulently obtained funds from East River Savings Bank ("ERSB") to purchase sixteen rent controlled apartments located at 504-506 West 111th Street in New York City.  Gray's co-conspirator went to ERSB and represented that he was interested in receiving a refinancing loan on four of the apartment units that he claimed to own in conjunction with a shell corporation created by Gray.  In fact, neither he nor Gray had any ownership interests in the units at all. Gray's involvement consisted of showing up at the closing, falsely identifying himself to ERSB officers as the owner of the existing mortgages on the property, providing the bank officers with

15

forged stock certificates purporting to show his ownership of the units, and also providing forged proprietary leases.

64.   In the summer of 1992, Gray was renting an apartment on the upper West Side of New York. He and this same co-conspirator developed a new, but similar scheme, in order to defraud ERSB again.   Gray's co-conspirator applied for a mortgage to purchase Gray's apartment, which Gray fraudulently claimed to own. Again, Gray showed up at the closing and misrepresented that he was the owner of the apartment, and gave ERSB officers forged stock certificates indicating the same.

65.   As a result of these fraudulent transactions, Gray was charged with one count of defrauding a bank. He pled guilty to this charge, and was thereafter sentenced to serve 366 days in a federal prison.

66.   One of the central issues in Gray's sentencing was whether he had provided "substantial assistance" to the U.S. Attorney's Office's investigation so as to warrant a downward departure under the sentencing guidelines. Gray argued that he was entitled to this downward departure because he provided information to the U.S. Attorney's Office that implicated an ERSB officer in his fraudulent schemes. The U.S. Attorney's Office, however, argued that Gray did not provide substantial assistance because their investigation uncovered facts indicating that, inter alia, (a) Gray had lied to them during their investigation, and (b) Gray had wrongly implicated a bank officer at ERSB as a participant in his fraudulent schemes in order to secure a shorter jail sentence for himself. Based on these arguments, the court refused to give Gray a downward departure for "substantial assistance."

67.   In addition to these fraudulent schemes that Gray pled guilty to, the U.S Attorney's investigation uncovered other criminal fraud perpetrated by Gray, although pursuant to the terms

16

of the plea agreement, the government could not charge Gray for any of this conduct. This other criminal conduct included Gray submitting a mortgage application to ERSB, which included several false or forged documents. Gray also used his father's name (Jack Gray, Sr.) for this mortgage application in place of his own because Gray's credit history was so poor. From January through May of 1993, Gray attempted to obtain a loan from ERSB by submitting various false and forged documents including false financial history, false bank statements, and false tax returns.

68. The U.S Attorney's Office also found that five months after Gray's and his co-conspirator's arrests for the fraud they both subsequently pled guilty to, they both submitted false financial information and grossly exaggerated their assets in an effort to obtain a $7 million line of credit (they only actually got about $3 million) that they used to purchase Shofar Kosher Foods, which was one of the business ventures Gray specifically alluded to in the PPM as one of his past, legitimate successes.

### Defendant's Repeated Misrepresentations and Fraud Relating to the Purported Acquisition of the William Greenberg Bakery

69. As alleged herein and as Gray represented to Dr. Connelly, and as he stated in the PPM, the purchase of the family-owned William Greenberg Bakery business for $400,000 was the centerpiece of Ecce Culina's business model. Gray's statements that the acquisition of the William Greenberg Bakery would allow Ecce Culina to open ten cafés, and how the Bakery's profitability would allow Ecce Culina to pay the 9% preferred interest rate to its members, were all significant material facts relied upon by Dr. Connelly in deciding to purchase his membership interests. Dr. Connelly also relied upon Gray's representations regarding the certainty of the Bakery acquisition, which were based, in part, on Gray's comment that the acquisition was certain because the Bakery was a family-run business and the owner wanted to sell, and based on

17

the representations that the purchase price of the Bakery was $400,000, and the representation that Ecce Culina had working capital of approximately $600,000, including his investment.

70.    But at the time Gray made these representations about Ecce Culina's planned acquisition of the William Greenberg Bakery, he knew or was reckless in not knowing that they were false and/or misleading due to the omission of various material facts.

71.    The William Greenberg Bakery was founded in 1947 by William Greenberg, Jr. This original entity was incorporated on November 12, 1993 as William Greenberg, Jr. Desserts & Cafes, Inc.  On July 10, 1995, William Greenberg, Jr. Desserts & Cafes, Inc. was acquired by Creative Bakeries, Inc., which then went public.  In the 1998 10-K for Creative Bakeries, Inc., the company stated that its William Greenberg Bakery subsidiary "no longer operates the commissary [kitchen] and does not directly operate any retail stores either. Instead it has licensed its name to an operator who runs retail and wholesale operations."

72.    The licensed operator of the William Greenberg name (the "Operator") has operated several retail and commercial bakeries in Manhattan under the Greenberg name since acquiring its rights in or about 1998.  This Operator also ran the Third Avenue location that was mentioned by the PPM and by Gray.

73.    The Operator states that he does remember entering negotiations to sell the business to Jack Gray a couple of years ago.  He stated that they even agreed on a price.  He felt that the deal was certain to go through, but suddenly stopped hearing from Gray and the deal fell apart. He stated that he believed that the deal fell through because Gray was unable to raise enough capital to cover the agreed-upon price.  The Operator states that his business closed the Third Avenue location long after the deal with Gray fell through, and long after he had even been in contact with Gray.  He states that he was able to break the lease, and did not sell it to any entity.

18

74.    Given these facts, Gray's representations that the deal fell through because Fauchon purchased the lease were materially false and misleading because the real reason the deal fell through was because Gray broke off contact with the Operator when he was unable to raise sufficient capital to meet the agreed-upon purchase price.

75.    Given these facts, Gray's representations in the PPM that the acquisition of the Bakery would cost $400,000 and in the Operating Agreement that Ecce Culina had raised $600,000 were materially misleading because Gray was unable to purchase the Bakery due to the fact that either the purchase price was actually higher than he represented it as being, or because Ecce Culina had not raised the amount of capital he represented that it had raised.

**Loss of Investment**

76.    As alleged herein, after relying on the Operating Agreement, the PPM, and other direct communications from Gray, and as a direct result of Gray's various misrepresentations described herein, Dr. Connelly has not received the promised preferred 9% annual interest rate to be paid to members for their contribution, has lost his entire $50,000 investment, and has lost opportunities for other investments during that time.  In addition, as a result of Gray's breaches of fiduciary duty, as a majority shareholder and as Managing Member, to the minority shareholders including Dr. Connelly, Dr. Connelly has suffered additional substantial damage.

## CAUSES OF ACTION

**Count One: Violation of Section 10(b) of the Securities Exchange Act and Rule 10b-5**

77.    Dr. Connelly restates and incorporates by reference paragraphs 1 through 76 in their entirety.

78.    As alleged herein, in connection with the purchase and sale of a security -- in this case the membership interests in Ecce Culina -- the Gray defendants made several material

19

misrepresentations and omissions that they knew, or were reckless in not knowing, were false or misleading.

79. As alleged herein, Dr. Connelly directly and reasonably relied upon these misrepresentations and material omissions in purchasing a membership interest in Ecce Culina.

80. Dr. Connelly has suffered damage in the form of a reduction of value in, or the total loss of, his membership interest as a result of his reliance on these misrepresentations and material omissions.

81. As a result, the Gray defendants are liable to Dr. Connolly under Section 10(b) of the Securities Exchange Act, 15 U.S.C. §78j(b), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5.

**Count Two:  Violation of New York General Business Law § 349(h)**

82. Dr. Connelly restates and incorporates by reference paragraphs 1 through 81 in their entirety.

83. As alleged herein, the Gray defendants have engaged in numerous acts and practices in the conduct of their business, trade and commerce that were both deceptive and misleading in a material way.

84. Dr. Connelly has suffered an injury as a result of the Gray defendants' materially misleading and deceptive acts and practices.

85. As a result of the Gray defendants' materially misleading and deceptive acts and practices, and the resulting injury that Dr. Connelly suffered, the Gray defendants are liable to Dr. Connelly under New York General Business Law § 349(h).

**Count Three: Fraud and Fraudulent Concealment**

86.   Dr. Connelly restates and incorporates by reference paragraphs 1 through 85 in their entirety.

87.   As alleged herein, in connection with the purchase of Dr. Connelly's purchase of his membership interest in Ecce Culina, the Gray defendants made several material misrepresentations and omissions that they knew, or were reckless in not knowing, were false or misleading.

88.   As alleged herein, Dr. Connelly directly and reasonably relied upon these misrepresentations and material omissions in purchasing a membership interest in Ecce Culina.

89.   Dr. Connelly has suffered damage in the form of a reduction of value in, or the total loss of, his membership interest as a result of his reliance on these misrepresentations and material omissions.

**Count Four: Breach of Fiduciary Duty**

90.   Dr. Connelly restates and incorporates by reference paragraphs 1 through 89 in their entirety.

91.   As a majority shareholder in Ecce Culina and as its managing member, the Gray defendants owed a fiduciary duty of utmost good faith and fair dealing to the other members, including Dr. Connelly.  Furthermore, under the explicit terms of the Agreement, the Gray defendants owed the other members a fiduciary duty of keeping safe all funds and assets belonging to Ecce Culina, and not employing those funds in any manner except for the benefit of the company.

92.   The Gray defendants breached this fiduciary duty to Dr. Connelly and the other members of Ecce Culina by, _inter alia_, failing to maintain proper capital accounts for them per

the Agreement; failing to take any steps towards the development of Ecce Culina; failing to keep the members informed of his actions as managing partner despite numerous demands; allowing funds belonging to Ecce Culina to be used for other purposes besides the benefit of the company; failing too pursue exit strategies for members; failing to pay taxes and keep Ecce Culina, LLC in good standing; and failing to keep and produce books and records of the company despite numerous demands.

93.   As a result of the Gray defendants' numerous breaches of this fiduciary duty, Dr. Connelly has suffered and continues to suffer damages including loss in value of his membership interest, the value of foregone opportunities, and substantial out of pocket and consequential damages flowing from the above, including ongoing attorneys' fees, costs and expenses.

**Count Five: Breach of Contract**

94.   Dr. Connelly restates and incorporates by reference paragraphs 1 through 93 in their entirety.

95.   In consideration for Dr. Connelly's $50,000 investment in Ecce Culina, the Gray defendants agreed to provide various services for the benefit of Dr. Connelly and other members of Ecce Culina, including, inter alia, providing management for Ecce Culina, keeping the books and records of Ecce Culina, maintaining capital accounts of the members, keeping members reasonably informed of Ecce Culina's development, and allocating the interest and profits to the members' capital accounts.

96.   As alleged herein, the Gray defendants have breached the Agreement by failing to provide these contracted for services.

97.   As a result of this breach, Dr. Connelly has suffered and continues to suffer damages including loss in value of his membership interest, the value of foregone opportunities,

22

and substantial out of pocket and consequential damages flowing from the above, including ongoing attorneys' fees, costs and expenses.

## Count Six: Breach of Covenant of Good Faith and Fair Dealing

98.   Dr. Connelly restates and incorporates by reference paragraphs 1 through 97 in their entirety.

99.   As alleged above, Dr. Connelly entered into an agreement with the Gray defendants and implicit in all such agreements is the covenant of good faith and fair dealing.

100.  As alleged herein, the Gray defendants breached this covenant of good faith and fair dealing on numerous occasions.

101.  As a result of this breach, Dr. Connelly has suffered and continues to suffer damages including loss in value of his membership interest, the value of foregone opportunities, and substantial out of pocket and consequential damages flowing from the above, including ongoing attorneys' fees, costs and expenses.

## Count Seven: Negligent Misrepresentation

102.  Dr. Connelly restates and incorporates by reference paragraphs 1 through 101 in their entirety.

103.  As alleged herein, in connection with the purchase of Dr. Connelly's purchase of his membership interest in Ecce Culina, the Gray defendants made several material misrepresentations and omissions with scienter, with no reasonable basis as to their truth, and with the intent to induce Dr. Connelly into making an investment.

104.  As alleged herein, Dr. Connelly directly and reasonably relied upon these misrepresentations and material omissions in purchasing a membership interest in Ecce Culina.

23

105. Dr. Connelly has suffered damage in the form of a reduction of value in, or the total loss of, his membership interest as a result of these misrepresentations and material omissions.

**Count Eight: Action for Accounting and for the Production of Books and Records**

106. Dr. Connelly restates and incorporates by reference paragraphs 1 through 105 in their entirety.

107. Dr. Connelly is a member of Ecce Culina, and retains certain rights of membership under the Agreement and the applicable law. Included in these rights are an ability to request an accounting for and a production of the books and records of Ecce Culina. Dr. Connelly has made such demands for an accounting and produce various books and records, but the Gray defendants have refused to respond.

108. Dr. Connelly requests that this court order the Gray defendants and Ecce Culina to provide an accounting for and produce the books and records for Ecce Culina.

**Count Nine: Conversion**

109. Dr. Connelly restates and incorporates by reference paragraphs 1 through 108 in their entirety.

110. As alleged herein, Dr. Connelly sent a check for $50,000 to the Gray defendants to be used to purchase a membership interest in Ecce Culina.

111. The Gray defendants failed to deposit this money into any account held by or for Ecce Culina, failed to apply it towards the purchase of any membership interest in Ecce Culina, have failed to apply it towards its intended use of developing Ecce Culina, and have refused to return or account for it in any way, despite numerous demands. In this manner, they exerted unauthorized dominion over Dr. Connelly's funds that should have been deposited and used for Ecce Culina.

24

112. As a result of this wrongful conversion, Dr. Connelly has suffered and continues to suffer damages including loss in value of his membership interest, the value of foregone opportunities, and substantial out of pocket and consequential damages flowing from the above, including ongoing attorneys' fees, costs and expenses.

## Count Ten: Constructive Trust

113. Dr. Connelly restates and incorporates by reference paragraphs 1 through 112 in their entirety.

114. Dr. Connelly possesses a membership interest in Ecce Culina.

115. The Gray defendants have failed to maintain the appropriate capital account for this membership interest, and have otherwise failed to account for it in any way, or apply it for the use contemplated by the Agreement and Memorandum.

116. Dr. Connelly requests that this court impose a constructive trust on the membership interest received by the Gray defendants and Ecce Culina that will constitute, in part, the amount owed to Mr. Connelly as a result of his position as member of Ecce Culina.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Michael Connelly prays and requests the following:

A.  Judgment in favor of Dr. Connelly against all defendants in an amount not less than all-direct, consequential, recissory and incidental damages suffered by him, as well as punitive damages.

B.  Award Dr. Connelly his costs and expenses incurred in this action, including his reasonable attorneys' fees pursuant to New York General Business Law § 349(h);

C.   Order such preliminary injunctive and equitable relief in order to preserve the

status quo and protect the assets, earnings and profits of Dr. Connelly's

membership share pending a final adjudication of this lawsuit;

D.   Upon a final adjudication in this matter, order such permanent injunctive and

equitable relief as is just and proper; and

E.   Award such other relief as this Court deems just and proper.

## JURY CLAIM

Plaintiff Michael Connelly claims a trial by jury on all claims so triable.

Dated:  New York, New York
         July 18, 2005

MICHAEL CONNELLY,

By his attorneys,

MINTZ LEVIN COHN FERRIS
GLOVSKY AND POPEO, P.C.

By: _____
Peter B. Zlotnick, Esq.  (PZ-5386)

The Chrysler Center
666 Third Avenue, 25th Floor
New York, New York 10017
Tel:  (212) 935-3000
Fax:  (212) 983-3115

- and -

Michael F. Connolly, Esq.
Breton Leone-Quick, Esq.
MINTZ LEVIN COHN FERRIS
GLOVSKY AND POPEO, P.C.
One Financial Center
Boston, Massachusetts  02111
Tel: (617) 542-6000
Fax: (617) 542-2241

26